A.S. Wikstrom, Inc. v. Commissioner.A. S. Wikstrom, Inc. v. CommissionerDocket No. 5578-67.United States Tax CourtT.C. Memo 1969-32; 1969 Tax Ct. Memo LEXIS 265; 28 T.C.M. (CCH) 143; T.C.M. (RIA) 69032; February 13, 1969, Filed John D. Bryant, 2-4 Fennell St., Skaneateles, N. Y., for the petitioner. Stephen M. Miller, for the respondent. 144 DAWSONMemorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined income tax deficiencies against the petitioner for the years 1959 and 1962 in the amounts of $701,927.78 and $91,274.44, respectively. Petitioner alleges in its petition a net operating loss for 1962, which may be carried back to 1959, greater than the amount determined by respondent and therefore claims that it is entitled to an additional refund of 1959 tax paid of $161,041.93. Several adjustments contained in the notice of deficiency were not put in issue by the petitioner. The issues presented for decision are: 1. In what year were the Soo and Kittery long-term contracts finally*266 completed and accepted for purposes of the completed contract method of accounting? 2. Should amounts received by petitioner in settlement of disputed claims relating to the Soo and Kittery long-term contracts for extras, changes, changed conditions, suspensions, delays and damages, not a part of the original contract work, be accrued as income in 1962 when the contract work was completed or in later years in which the respective claims were settled? 3. Should an amount withheld by the Navy for payments otherwise due to petitioner on account of possible liquidated damages for delay in completing the Kittery contract work be accrued as income in 1962 when the contract work was completed or in 1963 when settled and payment made? 4. Should an amount withheld by the Corps of Engineers on account of Michigan tax liability from payments otherwise due to petitioner for the Soo contract be accrued as income in 1962 when the contract work was completed or in 1965 when settled and payment made? Findings of Fact Many of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. A. S. Wikstrom, *267 Inc. (herein called petitioner) is a New York corporation which has had at all times material hereto (including the date on which the petition in this proceeding was filed) its principal place of business in Skaneateles, New York. Petitioner filed its original Federal corporate income tax returns for the calendar years 1959 and 1962, and an amended return for the year 1962, with the then district director of internal revenue, Syracuse, New York. On its original 1962 return petitioner claimed a net operating loss of $836,537.73, while on its amended 1962 return the net operating loss was increased to $1,351,889.65. The net operating losses shown on petitioner's original and amended returns for 1962 were claimed as carrybacks to petitioner's taxable year 1959, as a result of which refunds were made for 1959 in the total amount of $702,982.61. Petitioner is a construction contractor in the business of building roads, bridges, power plants and industrial facilities, principally throughout the eastern half of the United States. Although petitioner is an accrual basis taxpayer in all other respects, it reports its income and expense from long-term contracts on the completed contract*268 method. Petitioner received approval from respondent to report its income from long-term contracts under the completed contract method of accounting, commencing for the year 1960. Prior to 1960, petitioner reported its income from long-term contracts under the percentage of completion method. In 1960, petitioner undertook two multiyear construction contracts. One such contract was awarded by the Corps of Engineers, U.S. Army, for work at Sault Ste. Marie, Michigan (herein referred to as the "Soo" contract); the other such contract was awarded by the Bureau of Yards and Docks, U.S. Navy, for work at Kittery, Maine (herein referred to as the "Kittery" contract). In the performance of construction contracts (in which business petitioner has been engaged for more than 20 years) extras, changes, changed conditions and delays, not a part of the original contract work, commonly arise which are the basis of claims by contractors for additional compensation. One of the reasons for this is that it is impossible to establish exact quantities when drawing up plans and specifications and it is impossible to design and project perfectly. It is standard practice to have disputes between the parties*269 as a result of these claims. In Federal government contracts provisions are made for determination of such claims. Both the Soo and Kittery contracts contained provisions for changes, changed conditions and procedures 145 for resolutions of disputes. Claims are frequently settled as they arise or before completion of the physical contract work. However, some of such claims often remain unsettled at the time of completion of the physical contract work. Resolution of such unsettled claims may not be achieved until months or years after completion of the physical contract work through negotiation, administrative procedures and litigation. Soo Contract The Soo contract, No. DA-20-064-CIVENG-61-41, dated December 22, 1960, was for the original contract amount of $4,947,950. The work required was first stage construction of a navigation lock, principally involving cofferdam construction, demolition and excavation of an existing lock. The entire work was required to be completed by January 1, 1963. In May 1962, the Corps of Engineers suspended a major portion of the work under the contract and, in June 1962, most of the remainder of the work was deleted due to the Corps' desire*270 to redesign the project. The Corps of Engineers, by letter dated March 1, 1963, accepted the entire Soo contract work as completed November 23, 1962. The letter stated that although the work was completed "because of outstanding claims, the subject of other correspondence, the contract will not be closed." No physical work under the contract was performed after November 23, 1962. The Corps of Engineers relieved the petitioner of maintenance of the contract work in 1962. The "FINAL-OFF" billing of the City of Sault Ste. Marie for water and sewer charges for petitioner's office for the Soo contract was dated December 31, 1962. Petitioner's use tax returns to the Michigan Department of Revenue, filed in connection with the Soo contract, showed $283.82 purchases in the January 1963 return, minus purchases in the February return and no activity in March. Petitioner reported to the Michigan Department of Revenue discontinuance in December 1962 of its business in Michigan, including the statement, "Construction Contract completed - no business being transacted within State of Michigan at present." Petitioner reported the Soo contract as completed on its 1962 income tax return, reporting*271 income of $4,072,463.73 and direct costs of $4,734,880.47, or a loss of $662,416.74. Through the end of 1962 petitioner had been paid $3,968,495.85, the Corps had withheld $102,767.88, and $1,200 was withheld as liquidated damages for late completion of a small portion of the work, a total of $4,072,463.73. These amounts were shown on Payment Estimate No. 23 prepared by the Corps and dated November 16, 1962. During the course of construction various extras, changes, changed conditions, suspension and deletions, not a part of the original contract work, arose which were the basis of claims by petitioner against the Corps of Engineers for additional compensation. As of the date of completion and written acceptance of the work, November 23, 1962, many of such claims had been resolved between petitioner and the Corps of Engineers and incorporated in change orders ("modifications"). Petitioner's remaining claims outstanding as of November 23, 1962, for extras, changes, changed conditions, suspension and deletions were summarized in a letter to the Corps of Engineers dated January 2, 1963. At the end of 1962, the Corps of Engineers did not agree that petitioner was entitled to payment*272 for the outstanding claims, the Corps did not admit liability as to the claims and there was no agreement as to amounts owed with respect to individual claims. A reasonable estimate could not be made at the end of 1962 as to the amount payable to petitioner in connection with its outstanding claims. Such claims, not a part of the original contract, outstanding as of November 23, 1962, were the subject of extensive settlement negotiations between petitioner and the Corps of Engineers. Such negotiations were held at Detroit, Michigan, and Syracuse, New York, as well as by letter and telephone. Negotiation meetings were held during 1963, 1964, and 1965. Hundreds of letters were exchanged between petitioner and the Corps setting forth their positions on petitioner's outstanding claims. Representative letters dealing with two of the 40-odd claims show: (1) As to a claim relating to the west center pier, the Corps acknowledged that a changed condition was encountered but offered to pay only $1,850 and $3,900 as compared to petitioner's claim for $45,947 and the ultimate settlement was $30,000; (2) as to a claim relating to payment for steel sheet piling and cell fill, the claim arose*273 in 1961 but was not 146 finally settled until 1965 upon petitioner's release of its remaining claims. Such letters, representative of all correspondence relating to the outstanding claims, show that the issues were complex and that no reasonable estimate of amounts payable on account of the claims, if any, could have been made at the end of 1962. One of petitioner's outstanding claims was settled and included in Change Order Modification No. 15 dated January 6, 1964, in the amount of $53,164.73. Nine additional claims were settled and included in Change Order Modification No. 16 dated March 11, 1964, in the amount of $69,000. These two change order modifications were paid under Payment Estimate No. 24 prepared by the Corps of Engineers and dated June 10, 1964. Petitioner accrued the payments under Estimate No. 24 as income in 1964, the year in which the claims included in the estimate were settled. Settlement negotiations continued with respect to petitioner's remaining outstanding claims relative to the Soo contract. On August 11, 1964, a representative of the Detroit District Office of the Corps of Engineers requested petitioner to make an overall dollar proposal to settle*274 all remaining claims. At that time the parties had reached agreement as to claim settlements amounting to about $227,000 which had not been paid and about $122,000 which had been paid under Change Order Modifications 15 and 16, a total of about $349,000. On August 24, 1964, a representative of petitioner proposed by telephone an overall settlement amount of $170,000 in addition to the amounts previously agreed. The $170,000 amount was offered by petitioner in settlement of 10 outstanding claims for which it had requested $566,943 and the Corps had offered $35,250. By telephone on October 20, 1964, the Corps of Engineers offered an additional settlement amount of $145,000 in lieu of the $170,000 additional amount requested by petitioner. The Crps' amount was based on an overall settlement and not on individual claim items and the Corps declined to discuss the claims on an individual basis. By telephone on October 20, 1964, petitioner offered a compromise settlement amount of $157,500. By telephone October 26, 1964, representatives of petitioner and the Detroit District of the Corps agreed to a settlement amount of $150,000 in addition to the approximately $349,000 claim settlements*275 already agreed. Petitioner was anxious to have the claim settlement formalized to the extent necessary for assignment of payments for collateral for loans. The proposed settlement was forwarded to the North Central Division of the Corps of Engineers in Chicago for approval. Petitioner urged that the settlement be finalized by letter to the Corps dated February 24, 1965. The Detroit District of the Corps replied that detailed estimating and documentation of the claims as to merit and costs involved substantial time, and that responses to detailed comments of the Chicago office were being submitted. By letter of April 1, 1965, to the North Central Division of the Corps in Chicago, petitioner reviewed the history of the contract and claims, complained of the withholding of payments and requested a meeting to resolve the settlement. By telephone April 21, 1965, a Corps representative from Detroit telephoned petitioner's representative and advised that the Chicago office had requested a $60,000 reduction, then a $20,000 reduction and now would approve the settlement proposal with a $4,000 reduction as an overall package settlement. Petitioner accepted the $4,000 reduction. All of*276 the outstanding adjustments and claims under the Soo contract were settled and paid under Payment Estimate No. 25-FINAL prepared by the Corps of Engineers and dated April 27, 1965. The settlement was formalized in Supplement No. 1 to Change Order Modification 16 and Change Order Modifications 17, 18, 19, 20 and 21. Petitioner did not participate in allocation of the final claim settlement among the settlement documents. The Corps of Engineers ultimately paid petitioner about 30 to 40 percent of the amounts requested by petitioner for the claims outstanding at the end of 1962. For some claims petitioner received nothing; for others a greater percentage was paid. Petitioner accured the settlement payments under Estimate No. 25-FINAL as income in 1965, the year in which the settlement was reached, excepting amounts previously accrued as retainages. After award of the Soo contract, a dispute arose between petitioner and the Corps of Engineers concerning Michigan sales and use taxes. The Corps asserted that the contract price included such taxes and that, 147 if petitioner was not required to pay such taxes to the State, the Corps was entitled to a credit for them. Petitioner*277 asserted that such taxes had not been included in its bid price for the contract and, if it did not pay the taxes, it was entitled to retain the benefit thereof. The Corps deducted from earnings otherwise due to petitioner, the amount of use tax as if it had been payable to the State. No use tax was actually paid to the State of Michigan. Petitioner reported $4,072,463.73 as income from the Soo contract in 1962, as shown on Payment Estimate 23. Included in such sum was the amount of $42,241.09 withheld by the Corps for the disputed Michigan Use Tax Liability. The dispute concerning Michigan use tax was detailed by petitioner in its letter to the Corps dated April 8, 1964. The use tax dispute continued throughout the construction period and throughout all negotiations respecting the Soo contract claims, and was not resolved until settlement in 1965. As a part of such overall settlement, petitioner was allowed one-half of the $44,857.53 then withheld by the Corps for disputed Michigan use tax liability, and such allowance was effected by deleting the former withholding and substituting a credit for $22,428.62 as the last entry on Payment Estimate 25 FINAL. The following is a tabulation*278 of the original Soo contract and subsequent modifications, and the respective years in which petitioner reported income (loss) therefrom: 148 ChangeRevisedOrder Modi-ContractDateficationDescriptionAmountTotalOriginal Contract$4,928,104.70Through Change OrderModification #141-6-64Mod. 15Item 41$53,164.73$4,981,269.433-11-64Mod. 16Item 4269,000.005,050,269.434-28-65Mod.16Supp. 1Work Deletions4-28-65Mod. 17Item 4351,500.005,101,769.434-28-65Mod. 18Item 4430,000.005,131,769.434-28-65Mod. 19Item 4589,883.005,221,652.434-28-65Mod. 20Item 4686,058.005,307,710.434-28-65Mod. 21Item 47,(-903,672.85)4,498,037.58including decrease in(94,000.00)estimated con- tractcost.4-27-65Credit for Michigan-22,428.624,475,608.96Use TaxYear of AccrualDate196219641965$4,072,463.73$-65,897.93$17,866.051-6-64$53,164.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,000.004-28-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,500.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,000.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,883.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,058.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,000.004-27-65-22,428.62*279 196219641965Income Reported$4,072,463.73$56,266.80$346,878.43Direct Expenses Deducted4,734,880.47nonenoneProfit (Loss) Reported(662,416.74)56,266.80346,878.43 149 Kittery Contract The Kittery contract, No. NBy-29605, dated October 20, 1960, was for the original contract amount of $4,103,588. The work required was for reconstruction of Drydock No. 3 and deepening of submarine berths at Portsmouth Naval Shipyard, Kittery, Maine. The work was required to be completed by July 17, 1962. The Navy, by letter dated February 26, 1963, confirmed that all contract work was completed December 13, 1962, and that such date was the completion date of the contract. No physical work was performed by petitioner after December 13, 1962. The Navy relieved petitioner of the obligation of maintaining the contract work in 1962. The Navy refunded to petitioner the balance of a deposit which petitioner made for telephone service to its office maintained at the shipyard for this contract, indicating termination of telephone service December 2, 1962. Petitioner's report dated December 10, 1962, to the administator of the Hoisting and Portable Engineers*280 health and welfare and pension funds showed employment through "12/8/62 FINAL" and was marked FINAL REPORT. Petitioner's unemployment insurance report to the Maine Employment Security Commission indicated no employment in Maine for the calendar quarter ended March 31, 1963. Petitioner's sales and use tax returns filed with the Treasurer of the State of Maine indicated taxable purchases of $1,423.82 in November 1962 and no taxable purchases in December 1962. Petitioner's weekly equipment report dated December 8, 1962, and marked FINAL indicated disposal of all remaining construction equipment assigned to the project, including the office trailer. Petitioner reported the Kittery contract as completed on its 1962 income tax return, reporting income of $4,308,338 and direct costs of $4,428,879, or a loss of $120,541. Through the end of 1962 petitioner had been paid $4,079,087 for contract work and Change Orders A through F, $37,251 was due for Change Order G and $192,000 was withheld for possible liquidated damages and other claims of the Navy against petitioner, a total of $4,308,338. These amounts were shown on Invoice Estimate No. 24 dated December 21, 1962, and on a Navy Voucher*281 paid January 31, 1963. No further payment estimate was prepared until a Navy Voucher paid May 15, 1963. During the course of construction various extras, changes, changed conditions, suspensions and delays, not a part of the original contract work, arose which were the basis of claims by petitioner against the Navy for additional compensation. As of the date of completion and written acceptance of the work, December 13, 1962, many of such claims had been resolved between petitioner and the Navy and incorporated in change orders. Petitioner's remaining claims outstanding as of December 31, 1962, for extras, changes, changed conditions, suspensions and delays, not a part of the original contract work, totaled $1,489,059, while the Navy asserted various claims for credits against petitioner in the total amount of $235,740. At the end of 1962, the Navy did not agree that petitioner was owed amounts on account of the outstanding claims and the Navy did not admit liability as to the claims. A reasonable estimate could not be made at the end of 1962 of amounts which petitioner would be paid on account of the outstanding claims. Such claims, outstanding on December 31, 1962, were the*282 subject of continued extensive negotiations between petitioner and the Navy. Such negotiations were at Kittery, Maine, Boston and Washington, as well as by letter and telephone. Negotiation meetings were held during 1963, 1964, 1965 and 1966. Hundreds of letters were exchanged between petitioner and the Navy setting forth their positions on petitioner's outstanding claims. Representative letters dealing with four of the claims show that the Navy refused repeatedly to acknowledge that changed conditions, refusals and requirements of the Navy had occurred which entitled petitioner to extension of completion time and additional compensation. Not until a letter dated June 28, 1965, did the Navy agree to payment of an amount of $2,271 for one of the claims and offer to negotiate as to a portion of another, although petitioner had first made claim by letter dated January 4, 1962, and earlier, and had requested $820,795 for such claims. Such letters, representative of all correspondence relating to the outstanding claims, show that the issues were complex and that no reasonable estimate of amounts payable on account of the claims, if any, could be made at the end of 1962. Thirty-six of*283 petitioner's claims were settled and included in Change Orders H 150 through P, inclusive, issued during 1963 and 1964. These change orders were paid under the Navy's TWENTY-SIXTH through THIRTIETH partial payments, inclusive, during 1963 and 1964. Petitioner reported such claim settlement payments as income in the respective years in which the claims were settled. A four-day hearing on the outstanding claims was held before the Navy Contract Award and Review Board July 11 to 14, 1966 at which witnesses appeared and testimony was taken. No decision was rendered by the board, the board requesting additional data and participation in further negotiations. Further negotiations took place on September 29 and November 4, 1966, but no settlement was reached. The Navy offered $75,000 as compared to petitioner's request for $800,000; then the Navy offered $95,000 and petitioner offered to accept $500,000; then the Navy offered $140,000 and petitioner came down to $300,000; then the Navy offered $170,000 and finally $175,000 in December 1966. Petitioner sent a letter dated December 20, 1966, to Wellpoint Dewatering Corporation, petitioner's subcontractor for dewatering work under the*284 Kittery contract which subcontractor had a financial interest in petitioner's outstanding claims. The letter discussed the Navy's offer of $175,000 for settling the outstanding claims, stated that this was as much as petitioner was going to be offered by the Navy and noted that if the offer was not acceptable it would be two to two and a half years before a decision could be obtained from the Armed Services Board. For such reasons, petitioner decided to accept the Navy's $175,000 settlement offer. The $175,000 settlement of petitioner's outstanding claims was formalized by Change Order R and paid by the Navy in January 1967. The final negotiations for settlement of petitioner's outstanding claims were on an overall, lump sum basis. The Navy ultimately paid petitioner about 35 to 40 percent of the amounts originally claimed by petitioner for the claims outstanding at the end of 1962. For some of the claims petitioner received nothing; for others a greater percentage was paid. Petitioner accrued the $175,000 Kittery claim settlement payment in 1966, the year in which settlement was reached. Under petitioner's contract with the Navy, completion by July 17, 1962, was required and*285 provision was made for charging petitioner liquidated damages at the rate of $1,250 per day for each calendar day of delay in completing the contract work. The Navy accepted the contract work as completed December 13, 1962. Petitioner claimed full payment for its earnings in Invoice Estimate No. 24 dated December 21, 1962, but the Navy's endorsement on the invoice recommended withholding $192,000 for possible liquidated damages for delay, and the Navy's voucher withheld the $192,000. The Navy's voucher paid May 15, 1963, reduced the withholding by $32,000, still withholding $160,000 for possible liquidated damages and other claims. By letter dated June 12, 1963, the Navy proposed to release the $160,000 withheld for liquidated damages by granting a time extension of 126 days to December 13, 1962, on the basis of allowing specific numbers of days of time extension for 12 specific causes of delay and allowing no time extensions for 11 other specific causes of delay. By letter dated June 25, 1963, petitioner refused the time extension on the basis of the delay distribution proposed by the Navy. Petitioner asserted that it had been entitled to time extensions far exceeding 126 days, *286 that the Navy had refused to grant the extensions or to discuss change orders to which petitioner was entitled, and that petitioner had accelerated the work at greatly increased costs to complete the work by December 13, 1962, and made claim for such increased costs. Petitioner requested the Navy to release $159,000 of $160,000 retained, leaving $1,000 held by the Navy. The Navy subsequently released all but $1 of the $160,000 withheld, the $1 being retained by the Navy to avoid release by petitioner of its remaining claims. Not until Change Order R formalizing the 1966 overall settlement of petitioner's claims, did the Navy extend the contract completion date to December 13, 1962, and the Navy's final payment voucher recited "Contract completed on time, therefore no liquidated damages are assessible." Petitioner reported $4,308,338 as income from the Kittery contract in 1962, as shown on Invoice 24. Included in such sum was the amount of $192,000 withheld by the Navy for "possible liquidated damages." The following is a tabulation of the original Kittery contract and subsequent changes and the respective years in which petitioner reported income (loss) therefrom: 151 RevisedContractDateItemAmountTotal196210-20-60OriginalthroughContractthrough12-12-62Change "G"$ 25,655.00$4,313,560.00$4,308,338.002-18-63Change "H"8,659.004,322,219.003-18-63Change "I"29,058.004,351,277.004-16-63Change "J"12,424.004,363,701.005-29-63Change "K"493.004,364,194.006-11-63Change "L"3,323.004,367,517.006-28-63Change "M"12,075.004,379,592.001-27-64Change "N"119,039.004,498,631.002-18-64Change "O"47,027.004,545,658.008-28-64Change "P"165,236.004,710,894.001-17-67Change "R"175,000.004,885,894.00*287 Year ofAccrualDate19631964196610-20-60through12-12-62$ 5,222.002-18-638,659.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,058.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,424.005-29-63493.006-11-633,323.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,075.001-27-64$119,039.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,027.008-28-64165,236.001-17-67$175,000.001962196319641966Income Reported$4,308,338.00$71,254.00$331,302.00$175,000.00Direct Expenses4,428,879.36000DeductedProfit (Loss)(120,541.36)71,254.00331,302.00175,000.00Reported 152 Opinion We must first decide in what year the Soo and Kittery contracts were "finally completed and accepted" for purposes of the completed contract method of accounting under section 451 1 and the regulations 2 promulgated thereunder. Petitioner contends that both contracts were finally completed and accepted in 1962, and the income relating thereto was properly reported in that year. Respondent, on the other hand, contends that the Soo and Kittery contracts were not finally completed and accepted in 1962 because the completed contract method of reporting gain or loss from a long-term contract requires that income*288 and expenses must be matched in a single accounting period, so that gain or loss from such a contract will always be reflected as a whole. Respondent points out and argues that the petitioner - Reported both the Soo and Kittery contracts as completed and accepted in 1962, including in income the amounts earned up to the end of 1962 and deducting therefrom all the expenses attributable to the performance of the contracts. However, after 1962 petitioner received and returned as income an additional $403,145 on the Soo contract against which no expenses were charged, and it received and returned an additional $577,556 on the Kittery contract against which no expenses were charged. Thus the claimed 1962 loss on Soo of $662,416 was overstated to the extent of $259,271, and the claimed 1962 loss on Kittery of $120,541 was transformed into a gain of $457,014. Overall, instead of a loss of $782,958 which petitioner reported in 1962, it actually wound up with a gain of $197,743. Clearly, petitioners reporting of these contracts as completed and accepted in 1962 is totally inconsistent with the purposes of completed contract method. Since 1962 is not the proper year in which to close the contracts, *289 there was no loss available to carry back to 1959. *290 Alternatively, respondent contends that, if the contracts were properly closed to profit and loss in 1962, all of the income and all of the expense must be accounted for in that year. As a result, he argues, petitioner actually realized a profit rather than a loss in 1962, and there is nothing available to carryback to 1959. We agree with petitioner that the Soo and Kittery contracts were "finally completed and accepted" in 1962. All work required under the contracts was completed in 1962. The final work under the Soo contract was accepted in writing by the Corps of Engineers as satisfactory and having been completed on November 23, 1962. The Navy confirmed in writing that December 13, 1962, was the completion of all contract work under the Kittery contract and would be considered for all contract purposes as the completion date of the contract. Petitioner performed no work under the Soo contract after November 23, 1962, or under the Kittery contract after December 13, 1962. Therefore, in 1962, all work under both the Soo and Kittery contracts was not only "substantially" completed but "finally" completed. See Ehret-Day Co., 2 T.C. 25, 33 (1943); Standard Paving Co., 13 T.C. 425, 438 (1949),*291 affd. 190 F. 2d 330 (C.A. 10, 1951), certiorari denied 342 U.S. 860 (1951); C. F. Martin, 34 B.T.A. 111 (1936); W.J. Scholl Co., 30 B.T.A. 993 (1934); and compare E. E. Black, Lts. v. Alsup, 211 F. 2d 879 (C.A. 9, 1954); Thompson-King-Tate, Inc. v. United States, 296 F. 153 2d 290 (C.A. 6, 1961); King v. United States, 220 F. Supp. 350 (D.C. E.D. Tex., 1963). As of the end of 1962, the amounts due to petitioner under the Soo and Kittery contracts for all contract work and settled claims were undisputed as to liability and reasonably ascertainable in amount from payment estimates prepared by the Corps of Engineers and the Navy, respectively. Determination of the year a contract is "finally completed and accepted" is a practical matter which depends upon the facts and not upon the whim or option of either the taxpayer or the Commissioner. Since claims for extras, changes, changed conditions and delays are common under construction contracts, the existence of unresolved claims should not be permitted to prevent a long-term contract from being considered complete, under the completed contract method, upon*292 full or substantial completion of the work required under the contract. Otherwise, a contractor could readily prevent "completion" of the contract (and thereby defer indefinitely the taxing of income from such contracts) merely by asserting claims, albeit legitimate, and declining to settle them until every last avenue of negotiation, administrative action, litigation and appeal is pursued to conclusion. Such resolution of disputed claims could take many years. The result of such deferral of closing contracts under the completed contract method until settlement of all claims would be a bonanza to contractors with long-term contracts and a disaster to the collection of tax revenues. Keeping a long-term contract open by asserting disputed claims would place the year of closing the contract for tax purposes at the election of the contractor, permitting him to defer for years reporting contract income or to close a contract in a year most favorable for tax purposes. It is true that the purpose of the completed contract method is to match income with expenses in one accounting period, i.e., the year in which the contract is finally completed and accepted. But, in the case of an accrual*293 basis taxpayer, only the income which has accrued prior to and during the year the contract is completed is required to be "matched" against accruable expenses. We reject respondent's contention that a contract cannot be considered "finally completed and accepted" until all claims, even those which are disputed and contingent, are resolved. We think the purpose of the completed contract method is best served herein by closing the Soo and Kittery contracts in 1962, when all work was completed and accepted, accruing in 1962 all contract income and settled claims, and deferring disputed and contingent claims until later years when the claims were settled and payments therefor, if any, could be determined with reasonable accuracy. See National Contracting Co., 37 B.T.A. 689 (1938), affd. 105 F. 2d 488 (C.A. 8, 1939), where it is said (pp. 701-702): Under the completed contracts method of accounting the ordinary rule in the case of items outstanding when a contract is "completed" is that "it is the right to receive and not the actual receipt that determines the inclusion * * *." Unless this accrual of outstanding items is made in the year of completion, the*294 purpose of the completed contracts method, namely, to account for the entire results of a contract at one time, is defeated. However, as a general principle, when outstanding items are "contingent and uncertain," such as disputed claims in litigation, accrual is not proper. Commissioner v. John Thatcher & Son, 76 Fed. (2d) 900; North American Oil Consolidated v. Burnet, 286 U.S. 417. While no case has apparently purported to determine this question under the long term contracts method, no reason appears why the rule should be less applicable to that type of accrual. And that this procedure may leave the exact profit or loss open for future adjustment is not fatal. W. J. Scholl Co., 30 B.T.A. 993, 997. We turn next to the question of when the disputed and contingent claims, relating to extras and changes, should be accrued as income. Petitioner reported income and expense for the Soo and Kittery contracts in 1962, the year of physical completion and acceptance of the contract work. There is no dispute that all contract expenses were accrued. Income was accrued as shown on contract pay estimates prepared at the end of 1962 by the Corps of Engineers*295 and the Navy, respectively. The contract prices shown on such pay estimates, together with all settled claims, were accrued by petitioner as income for all contracts even though portions of such amounts were not paid until a later year. No further pay estimate was prepared by the Corps relating to the Soo contract until June 1964, nearly one and one-half years after 1962. No further pay estimate was prepared by the Navy until May 15, 1963, nearly six months after 1962 and after 1962 tax returns were filed. 154 Payments after 1962 in connection with the Soo and Kittery contracts were for claims for extras, changes, changed conditions, suspensions and delays which were not a part of the original contract work. The undisputed testimony of petitioner's president, who was fully familiar with such claims, was that the claims outstanding at the end of 1962 were contested as to liability and amount, and that a reasonable estimate could not be made at the end of 1962 as to the amount payable to petitioner on account of its claims. Inability to reasonably estimate in 1962 the amount payable on the claims is further established by testimony and documents showing that final settlements*296 for both the Soo and Kittery claims were on an overall, compromise lump sum basis without relation to specific items or amounts claimed by petitioner. Section 1.451-1(a), Income Tax Regs., provides that income under the accrual method of accounting should be included in gross income when all events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. See United States v. Safety Car Heating & Lighting Co., 297 U.S. 88 (1936); Spring City Foundary Co. v. Commissioner, 292 U.S. 182 (1934); Security Flour Mills Co. v. Commissioner, 321 U.S. 281 (1944). A taxpayer can be on the accrual basis of accounting and still compute its income from long-term contracts on the completed contract method. A. D. Irwin, 24 T.C. 722 (1955), affd. 238 F. 2d 874 (C.A. 3, 1956). When outstanding items are disputed, contingent and uncertain accrual is not proper. Dingle-Clark Co., 26 T.C. 782 (1956); Jamaica Water Supply Co., 42 B.T.A. 359 (1940), affd. 125 F. 2d 512 (C.A. 2, 1942). It is clear that after 1962 petitioner continued*297 active negotiations with the Corps of Engineers and the Navy, respectively, for resolution of petitioner's claims, outstanding as of December 31, 1962, relating to the Soo and Kittery contracts for extras, changes, changed conditions, suspensions, delays and damages not a part of the original contract work. Such claims were legitimate, bona fide claims but were in dispute as to liability, amount or both. Some of such claims were settled and paid in 1963 and 1964. The bulk of the outstanding claims relating to the Soo contract were settled on an overall, compromise basis in 1965. The outstanding claims relating to the Kittery contract were settled on an overall compromise basis in 1966. Liability as to the claims was actively contested by the Corps of Engineers and the Navy. The amounts ultimately paid to petitioner in settlement of its claims outstanding at the end of 1962 could not have been reasonably estimated at the end of 1962. Therefore, we hold that petitioner properly accrued the disputed and contingent claims in the years in which they were settled. See National Contracting Co., supra at p. 702; A. D. Irwin, supra at p. 728. We disagree with petitioner*298 that the amount of $192,000 withheld by the Navy for possible liquidated damages for delay in completing the Kittery contract was uncertain and contingent and was incorrectly accrued as income in 1962. There was no dispute that the $192,000 had been earned by petitioner. The only question was whether any part of such earnings up to a maximum of $192,000 should be retained for "possible liquidated damages." Whether any amount would be deducted from the amount payable on the contract was speculative. Petitioner admitted, by accruing the $192,000 in 1962, that it had been earned in that year. Cf. Rosa Orino, 34 B.T.A. 726, 731 (1936). Petitioner's reliance on Albin Johnson, 6 T.C.M. 255 (1947), is misplaced because in that case the Government had determined that it was entitled to liquidated damages. By contrast, there was no determination in this case in 1962 or any subsequent year that the Navy was entitled to liquidated damages, and in fact the entire amount of the retainage was released and paid to petitioner in 1963. Included in the $4,072,463.73 accrued as income in 1962 for the Soo contract was the sum of $42,241.09 withheld by the Corps of Engineers*299 for Michigan use tax liability, which withholding petitioner disputed. The use tax dispute remained unresolved when the contract work was completed and accepted on November 23, 1962, and was the basis of one of the claims pressed by petitioner against the Government. The use tax dispute continued throughout all negotiations relating to the Soo contract claims and was not resolved until the overall settlement of the Soo claims in 1965. As a part of such overall settlement, petitioner was allowed one-half of the disputed amount 155 then withheld by the Corps of Engineers for use tax liability. The question of Michigan use tax liability was a genuine controversy between petitioner and the Corps of Engineers. Even in the overall settlement, the resolution of the use tax dispute was made by an arbitrary allowance of half of the disputed amount. Until such final settlement in 1965, the Michigan use tax liability was vigorously disputed, was at issue both as to liability and amount and was contingent and uncertain. In such circumstances we conclude that no portion of such disputed Michigan use tax liability should have been accrued as income in 1962, the year in which the Soo contract*300 work was finally completed and accepted. United States v. Safety Car Heating & Lighting Co., supra; Spring City Foundry Co. v. Commissioner, supra. We further hold that the net operating loss realized by petitioner in 1962 may be carried back as a net operating loss deduction to 1959 and that petitioner is entitled to any overpayment for 1959 resulting from such net operating loss deduction. To reflect the uncontested adjustments and the conclusions reached herein, Decision will be entered under Rule 50. Footnotes1. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated. ↩2. Pertinent portions of sections 1.451-1 and 1.451-3, Income Tax Regs., are as follows: § 1.451-1 General rule for taxable year of inclusion. (a) General rule. Gains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer unless includible for a different year in accordance with the taxpayer's method of accounting. Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. § 1.451-3 Long-term contracts. (a) Definition. The term "long-term contracts" means building, installation, or construction contracts covering a period in excess of one year from the date of execution of the contract to the date on which the contract is finally completed and accepted. (b) Methods. Income from long-term contracts (as defined in paragraph (a) of this section), determined in a manner consistent with the nature and terms of the contract, may be included in gross income in accordance with one of the following methods, provided such method clearly reflects income: * * * (2) Completed contract method. Gross income derived from long-term contracts may be reported for the taxable year in which the contract is finally completed and accepted. Under this method, there shall be deducted from gross income for such year all expenses which are properly allocable to the contract, taking into account any material and supplies charged to the contract but remaining on hand at the time of completion.↩